# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 7, 2019 Session

## TERESA GRIMES KIDD, ET AL. v. JAMES Q. DICKERSON, ET AL.

**Appeal from the Circuit Court for Maury County**
**No. 15520    David L. Allen, Judge**

_____

### No. M2018-01133-COA-R3-CV
_____

In this health care liability action, the surviving daughter of a woman who died as a result of a stroke brought suit as executrix of her mother's estate and as her next-of-kin against two physicians and their practice group as well as a pharmacist who filled a prescription for her and the pharmacist's employer. Plaintiff alleged that the death occurred due to a stroke her mother suffered as a result of taking the drug Pradaxa, which had been prescribed by the defendant doctors and filled by the defendant pharmacist and the defendant pharmacy (the "pharmacy defendants"). The trial court granted summary judgment to the pharmacy defendants on all claims, holding that the proof submitted by Plaintiff was insufficient to establish the element of causation; the court granted summary judgment to the defendant doctors on Plaintiff's claims that their negligence caused and hastened the decedent's death, and the claim that the doctors did not have the decedent's informed consent to administer Pradaxa; the court granted summary judgment to one doctor on all claims; and the court denied summary judgment to one doctor and the practice group on the remaining claims. Plaintiff appeals the grant of summary judgment to the pharmacy defendants and the doctors; the remaining doctor and practice group appeal the denial of their motions for summary judgment on the remaining claims. Upon our *de novo* review, we affirm the grant of summary judgment to the pharmacy defendants; we affirm the grant of summary judgment to Dr. Thomas Farmer *in toto*; we affirm in part the grant of partial summary judgment to the doctors and their group and remand for further proceedings on whether the nurse practitioner's actions caused Ms. Grimes' injury and suffering during the period of October 20 until she was stabilized in the hospital, as well as whether the remaining doctor and practice group are liable for that negligence under a respondeat superior theory.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part; Case Remanded**

J. STEVEN STAFFORD, P.J., W.S.,[1] delivered the opinion of the court, in which CARMA DENNIS MCGEE, J., joined. RICHARD H. DINKINS, J., not participating.

---

[1] This opinion was assigned to the authoring judge on September 2, 2020.

William Kennerly Burger, Murfreesboro, Tennessee, for the appellants, Teresa Grimes Kidd and Estate of Doris Ann Holt Grimes.

Marc Sorin, Memphis, Tennessee, for the appellees, Rite Aid of Tennessee, Inc. and James Q. Dickerson.

J. Eric Miles, Phillip North, and Brent A. Kinney, Nashville, Tennessee, for the appellees, Thomas William Farmer, M.D., Charles Albert Ball, M.D., and Family Health Group, Inc.

## OPINION

On September 30, 2014, 82-year-old Doris Grimes went to the Family Health Group ("Family Health Group" or "FHG") in Columbia, Tennessee, complaining of pain and swelling in her lower left arm; she was seen by her primary care physician, Dr. Charles Ball, who diagnosed her with a blood clot. On October 7, she returned to the practice, complaining of a sudden onset of pain behind her right knee. She was seen by another doctor in the practice, Dr. Thomas Farmer, who ordered further diagnostic evaluations; he concluded that Ms. Grimes had a blood clot and prescribed a blood-thinning medication known as "Pradaxa." Ms. Grimes had the prescription filled that day by pharmacist James Dickerson at a Rite Aid Pharmacy.

Ms. Grimes returned to Family Health Group on October 13 for a follow-up appointment relative to swelling in her leg. Her medical chart recites that she was "placed on one week of [P]radaxa and made appointment with [Dr. Ball] after seeing Dr. Farmer." The chart records that Ms. Grimes stated that her leg "does get tender and sore if she stands to[o] long," and that she has "a little bit of swelling at times." The entry for October 13 states that Dr. Ball observed that the swelling in her leg was "now completely resolved," that he changed her prescription to Xarelto, 20 milligrams daily, and set a one month follow-up appointment. On October 20, Ms. Grimes returned and was seen by a nurse practitioner, Shavonne Frierson; at that visit, an exam was conducted, which resulted in findings that Ms. Grimes was "ill appearing" and her cardiovascular rhythm was "irregularly irregular." A chest x-ray was conducted, and an entry in her chart states that she was to be referred to a cardiologist "this week."

On October 21, Ms. Grimes fainted and was seen at the Maury Regional Medical Center emergency room and admitted to the hospital for further examination and treatment. A consultation with a radiation oncologist was conducted on October 24, who diagnosed her with a stage IV "malignant neoplasm of fundus of stomach" and said that "[t]he patient is symptomatic from blood loss secondary to her tumor in her stomach." Ms. Grimes' pathology "returned with invasive gastric adenocarcinoma"; "prior imaging had revealed a mass in liver which is now consistent with metastatic disease." An MRI on October 24 revealed "multiple strokes consistent with embolic etiology." Ms. Grimes was

2

subsequently diagnosed with "healthcare associated pneumonia" and later transferred to a nursing home; she remained non-communicative and non-responsive until she expired on November 21, 2014.

Ms. Grimes' daughter, Teresa Kidd ("Plaintiff" or "Ms. Kidd"), filed a healthcare liability action on January 22, 2016 in her capacity as executrix of her mother's estate and as her next-of-kin; the complaint named as defendants Drs. Farmer and Ball and Family Health Group, (collectively, "Defendant Doctors"), as well as pharmacist James Dickerson and Rite Aid (collectively, "Pharmacy Defendants"). The complaint sought compensatory damages for the "excruciating pain and suffering" endured by Ms. Grimes in the six-week period preceding her death, as well as the cost of all medical expenses; Ms. Kidd sought damages on her own behalf as well as the estate for "loss of companionship, enjoyment of life, and any related economic losses."

The complaint alleged that the Defendant Doctors breached the acceptable standard of professional practice by not recognizing "that internal loss of blood could explain the dramatic deterioration in the decedent's physical condition since the commencement of the Pradaxa," and that "[t]he decedent's scant medical chart, as maintained and reviewed by Drs. Farmer and Ball, reveals no informed consent, minimal or otherwise, regarding the well-known, well-documented, potentially dangerous and irreversible side effects of the drug Pradaxa."

The complaint alleged that the Pharmacy Defendants breached the acceptable standard of professional care "by failing to provide adequate instructions to the decedent regarding the potentially dangerous and irreversible side effects of the drug Pradaxa . . . which proximately and directly contributed in a substantial manner to the death of the decedent due to uncontrolled internal bleeding and a related stroke on November 21, 2014."

The Pharmacy Defendants answered, denying liability and asserting the affirmative defenses of standing, the one-year statute of limitations, failure to state a claim, comparative fault, intervening cause, and others. The Defendant Doctors answered, denying liability and asserting the affirmative defenses of, *inter alia*, comparative fault, assumption of the risk, and the statutes of limitation and repose.

In due course, the Defendant Doctors moved for summary judgment, asserting that Plaintiff was unable to prove the essential element of causation for her claims. Accompanying their motion, they filed a statement of fourteen undisputed facts. Ms. Kidd filed a statement of additional undisputed facts, to which the Defendant Doctors responded, disputing all.

The Pharmacy Defendants also moved for summary judgment, asserting that "there is no genuine issue of material fact concerning the Plaintiff's failure to present evidence sufficient to establish any act or omission on the part of these Defendants that caused the

3

alleged wrongful death of Plaintiff's decedent." The Pharmacy Defendants included a statement of nine material facts in support of their motion, which Plaintiff did not dispute.

The trial court held hearings on both summary judgment motions on October 2, 2017; by order entered December 12, the trial court granted the Pharmacy Defendants' motion, holding that the expert opinions of Dr. Arthur Axelbank, a physician, and Roger Lander, a pharmacist, which had been tendered by Plaintiff, did not establish causation. The order was certified final by an order entered May 18, 2018, *nunc pro tunc* to May 11, and Ms. Kidd filed a notice of appeal of the order on June 18.[2]

By order entered December 12, 2017, the trial court denied the Defendant Doctors' motion for summary judgment, holding that, *inter alia*, the evidence submitted by Plaintiff's expert, Dr. Axelbank, was sufficient to create a genuine issue of material fact on the issue of causation.

The Defendant Doctors deposed Dr. Axelbank a second time and renewed their motion for summary judgment on March 1, 2018; they filed a statement of 32 undisputed material facts, to which Ms. Kidd responded, disputing 12 of the statements. After a hearing on the motion, the trial court entered an order granting summary judgment to the Defendant Doctors on the issue of whether their negligence caused Ms. Grimes' death, on Plaintiff's informed consent claim, and on Plaintiff's claim that the doctors' negligence hastened Ms. Grimes' death. The order granted summary judgment to Dr. Farmer on all claims and dismissed him from the suit, finding that the evidence was undisputed that he was not involved in the treatment of Ms. Grimes after October 7. The court awarded summary judgment on the issue of whether it was medical negligence to prescribe Pradaxa and Xarelto simultaneously, as "the undisputed proof is that Ms. Grimes never took the Xarelto" and "there were no damages flowing from that alleged negligence." The court denied summary judgment to the Defendant Doctors on the issues of whether Dr. Ball failed to supervise Nurse Frierson and whether Dr. Ball and Family Health Group caused Ms. Grimes' injury and suffering.

Ms. Kidd filed a motion to alter or amend the judgment or, in the alternative, for an interlocutory appeal. The Defendant Doctors also filed a motion to alter or amend. Pursuant to the Defendant Doctors' motion, an amended order granting partial summary judgment was entered on August 17. On August 21, the trial court entered an order denying Ms. Kidd's motion to alter or amend but granting her motion to seek a Rule 9 interlocutory appeal and setting forth the court's reasons for granting the motion for interlocutory appeal. The order also stated that it granted in part the Defendant Doctors' motion to alter or amend

---

[2] Because Plaintiff's notice of appeal was filed within thirty days of the clerk's entry of the order, it was timely. *Cf. **Carter v. Bd. of Zoning Appeals of City of Nashville***, 214 Tenn. 42, 47, 377 S.W.2d 914, 916 (1964) ("[A] judgment could not be entered nunc pro tunc so as to cut off a party's right to appeal."); ***McCown v. Quillin***, 48 Tenn. App. 162, 169, 344 S.W.2d 576, 580 (1960) ("[A] nunc pro tunc judgment, although otherwise entirely proper, could not be used to deprive the losing party of his right of appeal.").

and attached the amended order, which had been entered on August 17, as an exhibit.

Ms. Kidd applied for interlocutory appeal of the grant of summary judgment to the Defendant Doctors pursuant to Rule 9(c) of the Rules of Appellate Procedure (as case M2018-01576-COA-R9-CV); the application was granted by the trial court and this Court. The Defendant Doctors filed an application for interlocutory appeal as well and an answer to Plaintiff's application in which they expressed their support for the interlocutory appeal. By order entered September 14, 2018, this Court granted the Doctors' application and consolidated it with Ms. Kidd's appeal of the grant of summary judgment to the Pharmacy Defendants.

Ms. Kidd articulates the following issues for our review:

1. Do genuine issues of material fact preclude summary judgment dismissal as to Defendants Pharmacist Dickerson and Rite Aid?
2. Do genuine issues of material fact preclude summary judgment dismissal as to Defendant Physicians, Farmer, Ball and Family Health Group, Inc.?

In the posture of appellee, the Defendant Doctors raise the following issues for our review:

1. The trial court appropriately ruled that Plaintiff's hearsay statements are inadmissible to show that any symptoms of blood loss were communicated to Defendants Thomas William Farmer, M.D., Charles Albert Ball, M.D., or Family Health Group, Inc. prior to October 20, 2014.
2. The trial court appropriately granted summary judgment in favor of Defendants Thomas William Farmer, M.D., Charles Albert Ball, M.D., or Family Health Group, Inc. as to Plaintiff's wrongful death claim.
3. The trial court appropriately granted summary judgment in favor of Defendants Thomas William Farmer, M.D., Charles Albert Ball, M.D., or Family Health Group, Inc., as to Plaintiff's "hastening of death" claim.
4. The trial court appropriately granted summary judgment in favor of Defendants Thomas William Farmer, M.D., Charles Albert Ball, M.D., or Family Health Group, Inc. as to Plaintiff's informed consent claim.
5. The trial court appropriately granted summary judgment in favor of Defendants Thomas William Farmer, M.D., Charles Albert Ball, M.D., or Family Health Group, Inc. as to any potential claim made by Plaintiff that prescribing Pradaxa and Xarelto at the same time violated the recognized standard of acceptable professional practice.
6. The trial court appropriately granted summary judgment in favor of Defendant Thomas William Farmer, M.D. as to all claims and theories.
7. The trial court erred in denying summary judgment in favor of Family Health Group, Inc. as to all claims.
8. The trial court erred in denying summary judgment in favor of Charles Albert Ball,

M.D. as to all claims.

## II. STANDARD OF REVIEW

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. Our Supreme Court has held:

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production by either (1) affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. . . . [S]ummary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. . . .

***Rye v. Women's Care Center of Memphis, MPLLC***, 477 S.W.3d 235, 264–65 (Tenn. 2015).

This court reviews the trial court's ruling on a motion for summary judgment *de novo* with no presumption of correctness, as the resolution of the motion is a matter of law. ***Rye***, 477 S.W.3d at 250 (citing ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997); ***Abshure v. Methodist Healthcare–Memphis Hosp.***, 325 S.W.3d 98, 103 (Tenn. 2010)). We view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. ***Godfrey v. Ruiz***, 90 S.W.3d 692, 695 (Tenn. 2002). "However, if there is any uncertainty concerning a material fact, then summary judgment is not the appropriate disposition." ***Moore v. City of Clarksville***, No. M2016-00296-COA-R3-CV, 2016 WL 6462193, at *3 (Tenn. Ct. App. Oct. 31, 2016). Indeed, we stated in ***Moore***:

> The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court,

however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. [The court] is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

*Moore*, 2016 WL 6462193, at *3 (quoting *EVCO Corp. v. Ross*, 528 S.W.2d 20, 24-25 (Tenn. 1975)).

### III. ANALYSIS

The elements of a healthcare liability claim (formerly called a "medical malpractice claim") were set forth in *Mitchell v. Jackson Clinic, P.A.*:

In order to prevail on a medical malpractice claim, a plaintiff must prove each of the elements set forth in Tennessee Code Annotated Section 29-26-115(a): (1) the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices; (2) that the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and (3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred. Each of these elements must be established by expert testimony.

420 S.W.3d 1, 6 (Tenn. Ct. App. 2013). "The Tennessee Code codifies the five common law elements of negligence: duty, breach of duty, causation, proximate cause, and damages." *Dubois v. Haykal*, 165 S.W.3d 634, 638 (Tenn. Ct. App. 2004) (citing *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)). "Without any one of these elements, [a] claim for medical malpractice cannot succeed." *Dubois*, 165 S.W.3d at 638 (citing *Kilpatrick*, 868 S.W.2d at 598). The Tennessee Supreme Court has stated the following regarding proof of causation:

[P]roof of causation equating to a "possibility," a "might have," "may have," "could have," is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty.

*Kilpatrick* 868 S.W.2d at 602 (citing *White v. Methodist Hosp. South*, 844 S.W.2d 642, 648–49 (Tenn. Ct. App. 1992)).

**A. Grant of Summary Judgment to Pharmacy Defendants**

The Pharmacy Defendants moved for summary judgment, asserting there was "no genuine issue of material fact concerning the Plaintiff's failure to present evidence sufficient to establish any act or omission on the part of these Defendants that caused the alleged wrongful death of Plaintiff's decedent." In the memorandum accompanying the motion, the Pharmacy Defendants explained that the only expert testimony presented by Plaintiff as to the effect of their alleged deviation from the standard of care was from a pharmacist, who was not qualified to make a medical diagnosis of causation. The trial court held that Mr. Lander's opinion was a medical diagnosis which he was not qualified to make and, consequently, could not be considered in ruling on the motion. In granting the motion, the court noted that the only opinion as to causation proffered by Plaintiff from a qualified expert was that of Dr. Arthur Axelbank, who opined that Ms. Grimes' death was "directly referable to the progressive and cumulative effects of the loss of blood caused by continued ingestion of Pradaxa, which led to severe intestinal bleeding. . . ", and that Plaintiff's attempt to incorporate and apply Dr. Axelbank's opinion to the acts of the Pharmacy defendants was "without any merit."

Here, Plaintiff admitted all of the undisputed material facts proposed by the Pharmacy Defendants. The following facts were therefore undisputed and material to the issue we address:

- Plaintiff relies solely on the affidavits of Dr. Axelbank and Roger Lander to support her cause of action.
- Dr. Axelbank testified in his affidavit that it was the Defendant Doctors' breach of the standard of care that caused Ms. Grimes' death.
- Roger Lander, a licensed and clinically active pharmacist, testified that the Pharmacy Defendants breached the applicable standard of care.
- Roger Lander testified that Ms. Grimes died "as a result of delayed diagnosis of an apparent acute gastrointestinal bleed."
- Dr. Ball testified, however, that Ms. Grimes died as a result of gastric cancer.
- Dr. Farmer testified that Ms. Grimes died of a stroke and cancer, as listed on her death certificate.

The Pharmacy Defendants argue first that these undisputed facts show that Plaintiff is relying solely on the affidavit of Mr. Lander to establish causation against them. The Pharmacy Defendants argue, however, that the trial court correctly excluded the opinion of Mr. Lander as he was not competent to make a medical diagnosis as necessary to establish causation. As such, they contend that the trial court correctly concluded that Plaintiff lacked proof to establish the causation element of this claim.

As an initial matter, we agree that causation as to this particular claim rests solely on the affidavit of Mr. Lander. Here, Plaintiff admitted that Dr. Axelbank testified in his affidavit that it was the negligence of the Defendant Doctors that caused Ms. Grimes'

8

death.[3] Dr. Axelbank's testimony therefore does not address the element of causation relative to the Pharmacy Defendants but states that Ms. Grimes' death was due to the breach in the standard of care by Drs. Farmers and Ball, which resulted in severe gastrointestinal bleeding that could have been avoided by "[i]mmediate and early intervention in suspending the ingestion of Pradaxa."[4] If Mr. Lander was correctly deemed incompetent to testify as to causation, then the trial court did not err in granting summary judgment as to this claim based on Plaintiff's lack of causation proof.

The admission or exclusion of expert proof is governed by Rules 702 and 703 of the Tennessee Rules of Evidence.[5] Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 states as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion

---

[3] Specifically, Plaintiff's response to the Pharmacy Defendants' statement of undisputed facts contains the following:

4.      According to his affidavit, it is Dr. Axelbank's opinion:

 that the treating physicians for Doris Ann Holt Grimes, Dr. Thomas Farmer and Dr. Charles Ball, deviated from acceptable standard of professional practice in their management and followup evaluation of Ms. Grimes, after having prescribed for her a potent blood thinner known a [sic] "Pradaxa." That deviation in the standard of professional practice more probably than not caused, or significantly contributed to the death of Ms. Grimes on November 21, 2014.

Affidavit of Arthur Axelbank, M.D., p. 3, ¶ 4. (Exhibit 1)

RESPONSE: Admitted.

[4] As discussed *infra*, Dr. Axelbank later testified at his deposition that he was not opining that the Defendant Doctors' negligence caused Ms. Grimes death. Dr. Axelbank's affidavit specifically states that his opinions may change based on new or additional facts. As such, where Dr. Axelbank's deposition and affidavit are inconsistent, we generally rely on his deposition.

[5] We note that like the other evidentiary decisions of the trial court discussed *infra*, Plaintiff did not specifically designate this evidentiary ruling as an issue on appeal. As discussed more fully below, this failure can result in waiver of the issues on appeal. *See generally* **Craig v. Hodge**, 382 S.W.3d 325 (Tenn.2012) (discussed in detail, *infra*). In this instance, however, the exclusion of Mr. Lander was the sole basis of the trial court's decision to grant summary judgment to the Pharmacy Defendants. As such, while it may not have been perfectly raised in this appeal, it was sufficiently raised so that we may review it.

9

or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

The trial court functions as the "gatekeeper" with regard to the admission or exclusion of expert testimony. *Payne v. CSX Transportation, Inc.*, 467 S.W.3d 413, 454 (Tenn. 2015). A trial court's decision to admit or exclude expert proof will therefore not be overturned on appeal except for an abuse of discretion. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005). An abuse of discretion can occur when the trial court applies an incorrect standard or reaches an illogical or unreasonable decision that causes an injustice to the party complaining. *Id.* In this specific context, "[a] trial court abuses its discretion when it . . . excludes testimony that meets the requirements of Rule[s] 702 and 703[.]" *Shipley v. Williams*, 350 S.W.3d 527, 552 (Tenn. 2011).

The thrust of the Defendant Doctors' argument on appeal is that Mr. Lander is simply unqualified to offer a causation opinion in this case because he is not a medical doctor. Both the Defendant Doctors and the trial court relied on this Court's opinion in *Richberger v. West Clinic, P.C.*, 152 S.W.3d 505 (Tenn. Ct. App. 2004), interpreting the case to hold that "[a] pharmacist is not qualified to make a medical diagnosis." The question presented in that case was whether a nurse could testify as an expert witness to satisfy the competency requirement at Tennessee Code Annotated section 29-26-115(b) on the issue of causation.[6] The trial court had ruled that Tennessee Code Annotated section 63-7-103(b)[7] prohibited the nurse from testifying as to causation; on appeal, upon a review of the statute and relevant cases, the ruling of the trial court was affirmed. *Id.* at 511.

---

[6] Tennessee Code Annotated section 29-26-115(b) states:

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

[7] Tennessee Code Annotated section 63-7-103(b) states:

(b) Notwithstanding subsection (a), the practice of professional nursing does not include acts of medical diagnosis or the development of a medical plan of care and therapeutics for a patient, except to the extent such acts may be authorized by §§ 63-1-132, 63-7-123 and 63-7-207.

Plaintiff, citing a multitude of cases, contends that the trial court erred, however, in excluding Mr. Lander's testimony regarding causation. According to Plaintiff, these cases stand for the proposition that "a properly qualified expert, with a 'trustworthy' foundation, may express an expert opinion on any subject within their field of expertise," and that "a highly-qualified pharmacology professor is trained to understand and identify the effects on a human body caused by a medication of any type." The facts involved and the dispositive law in the cases cited by Plaintiff differ markedly from that at bar, and do not lead us to conclude that excluding Mr. Lander's opinion of causation was error.

The first case, *Dubois v. Haykal, M.D., et al.*, 165 S.W.3d 634 (Tenn. Ct. App. 2005), was a healthcare liability action; the plaintiff sued her doctor and pharmacy for their failure to warn her that the medication she was prescribed to treat her bipolar disorder was known to negatively impact the effectiveness of the oral contraceptive she was also taking. *Id.* at 636. The plaintiff alleged that, because of the interaction between the medications, she became pregnant. *Id.* The trial court granted the defendants' motions for summary judgment, determining that the testimony of the plaintiff's two expert witnesses, one a pharmacist and the other an OB/GYN, as to causation was not reliable and, therefore, inadmissible. *Id.* at 636, 638–40.

On appeal, this court identified the causation question, consistent with Tennessee Code Annotated section 29-26-115(a), to be whether the prescribed drug reduced the effectiveness of the oral contraceptive; we also identified the trial court's gatekeeping function with respect to the expert opinions, pursuant to Rules 702 and 703. *Id.* at 637–638. We discussed at length the testimony of the plaintiff's experts and reversed the grant of summary judgment, stating that "[a]fter considering the record as a whole, the qualifications of the expert witnesses, and the data and research upon which they relied, . . . the trial court erred when it decided to exclude [the expert witnesses'] testimony relating to causation on the grounds that it would not substantially assist the trier of fact or was untrustworthy." *Id.* at 639–40. Our discussion of each witness's testimony acknowledged that the pharmacist's opinion that the prescription "compromised the therapeutic effects of the oral contraceptives" taken by the plaintiff focused on the interaction of the medications, while the physician's opinion that the prescription "was more likely than not the cause of Appellant's unplanned pregnancy" was presented "in order to establish the element of causation." *Id.* at 639. We noted that the differences in the scope and factual basis of the opinion that each witness offered was based on that witness' expertise. Resolving the case as an issue of reliability of the testimony, rather than competence of the witness to express the opinion, we held that each opinion was reliable and admissible in accordance with Rules 702 and 703.

Another case, *Smith v. Pfizer Inc.*, 688 F. Supp. 2d. 735 (M.D. Tenn. 2010), was brought by the widow of a man against the manufacturers of medication her husband was taking for pain. The plaintiff alleged the medication caused him to become depressed and

11

commit suicide; she asserted claims for negligence, products liability, breach of implied warranty, and fraudulent concealment. *Id.* at 735. Defendants moved for summary judgment, asserting that the plaintiff could not show that the medication was the actual and proximate cause of her husband's death. *Id.* at 741. In order to counter defendants' argument that the decedent did not take the medication in the days leading to his suicide, plaintiff sought to introduce the statement her husband made to a pharmacist five days before his death that he felt "loopy" and that he "did not feel like himself" since he had been taking the medication. *Id.* at 742–43. Defendants' argument that the testimony of the pharmacist was inadmissible hearsay and not within the exception at Rule 803(4) of the Federal Rules of Evidence for statements made for purposes of medical diagnosis and treatment was rejected by the court; on the basis of the advisory committee note and precedent, the court held that statements to persons other than medical doctors come within the exception and admitted the testimony. *Id.* at 744–45. Contrary to Plaintiff's argument, **Smith v. Pfizer** does not "stand[] for the basic and fundamental proposition that a trained pharmacist is capable of providing a causation opinion regarding medical harm to the body."

The other cases relied upon by Plaintiff to support her argument likewise are not persuasive. **Dooley v. Everett**, 805 S.W.2d 380 (Tenn. Ct. App. 1990), was a negligence action in which a pharmacy was sued by the parents of a three-year-old child to recover for cerebral seizures suffered by the child as a result of toxic levels of a certain medication in his blood, which had been prescribed for his asthma in addition to another prescribed medication; both medications had been filled by the same pharmacist. *Id.* at 382. The trial court granted summary judgment to the pharmacy and dismissed the complaint, holding that there was no duty owed by the pharmacy. *Id.* On appeal, the question presented for this Court was "whether a pharmacist has a duty to warn a customer and/or the customer's physician of the potential interaction between two different prescription drugs written by the same physician on two different days and which are filled as written by the same pharmacist on different days." *Id.* at 381–82. We held that, under the facts of the case, a disputed issue of fact existed as to whether the duty to warn of a potential drug interaction was within the scope of the duties a Tennessee pharmacist owes to its customers and reversed the grant of summary judgment. *Id.* at 385. In this case, the excluded opinion related to the issue of causation, not duty; the **Dooley** case is not authority for the proposition that a pharmacist can provide a medical opinion of causation.[8]

Similarly, in **Pittman v. Upjohn Co.**, 890 S.W.2d 425 (Tenn. 1994), the Tennessee Supreme Court addressed the nature of the duty owed by a pharmacist. In reviewing the grant of summary judgment to the pharmacist, the court held that the pharmacist's duty to

---

[8] In the case at bar, the nature of the legal duty owed Ms. Grimes, if any, was not discussed by the trial court; indeed, the only reference to the pharmacist's duty is the trial court's finding that "[a]t the time the prescription was filled, the pharmacist. . . admits that he failed to follow the standard policy [of the pharmacy] of having Ms. Grimes sign an acknowledgment that she had elected to either waive, or receive, the warning information regarding the risks associated with Pradaxa."

warn, as established by the rules and standards of practice adopted by the Tennessee Board of Pharmacy, did not extend to the plaintiff because the plaintiff failed to show that the injury was reasonably foreseeable. *Id.* at 435. Again, whether the pharmacist could render a medical diagnosis of causation was not the issue presented or resolved, and Plaintiff's attempt to expand the holding fails.

Although not cited by Plaintiff, we note that another case is somewhat analogous: ***Pullum v. Robinette***, 174 S.W.3d 124 (Tenn. Ct. App. 2004). In ***Pullum***, the plaintiff brought a claim against her dentist for damages caused by an allegedly negligently performed root canal, resulting in nerve damage. *Id.* at 127. The defendant filed a motion *in limine* to exclude the plaintiff's expert, a dentist, because he was not a medical doctor. The trial court denied the motion, the case went to trial, and the jury awarded the plaintiff damages. *Id.* at 128.

On appeal, the defendant argued, *inter alia*, that the trial court abused its discretion in allowing the defendant to testify as to causation, citing ***Richberger*** and other cases. Nevertheless, we ruled that the trial court did not err in allowing the dentist to testify as "[t]he statutory test for expert testimony as to any of the elements required to recover for health care malpractice is whether the expert is licensed to practice and has practiced "a profession or specialty which would make the person's expert testimony relevant to the issues in the case.'" *Id.* at 142 (citing Tenn. Code Ann. § 29-16-115(a)(3)). According to this Court, the dentist testified that "learning about the nerves in the face and head was part of his dental training" and that the dentist "exhibited his knowledge of how nerves function and how anesthesia, administered by dentists, affects that functioning[.]" *Id.* at 143. As such, we held that the dentist's testimony was sufficient to establish causation.[9]

It is not disputed in this case that the ability to diagnose is regarded as part of the practice of medicine. Tenn. Code Ann. § 63-6-204(a)(1) ("Any person shall be regarded as practicing medicine within the meaning of this chapter who treats, or professes to diagnose, treat, operates on or prescribes for any physical ailment or any physical injury to or deformity of another."). Unlike the health care liability statutes of other states,[10] however, our health care liability statute does not limit testimony to only doctors, but rather to those

_____

[9] We note, however, that the ability to diagnose is specifically within the realm of a dentist's expertise by statute. *See* Tenn. Code Ann. § 63-5-108 ("Dentistry is defined as the evaluation, diagnosis, prevention and/or treatment, by nonsurgical, surgical or related procedures, of diseases, disorders and/or conditions of the oral cavity, maxillofacial area and/or the adjacent and associated structures and their impact on the human body, provided by a dentist within the scope of such dentist's education, training, and experience, in accordance with the ethics of the profession and applicable law.").

[10] For example, the corresponding Texas statute on this issue specifically states that "in a suit involving a health care liability claim against a physician or health care provider" a person is qualified as an expert witness as to causation "only if the person is a physician[.]" Tex. Civ. Prac. & Rem. Code Ann. § 74.403. Based on this language, "Texas courts have uniformly interpreted these statutes as requiring a medical doctor to opine on causation in health care liability claims." ***Walgreen Co. v. Boyer***, No. 01-19-00093-CV, 2020 WL 1879552, at *3 (Tex. App. Apr. 16, 2020).

in the "health care profession" so long as they are licensed, meet the locality rule, and practice "a profession or specialty which would make the person's expert testimony relevant to the issues in the case" for a sufficient period of time. Tenn. Code Ann. § 29-16-115(a)(3). And unlike the statute at issue in **Richberger**, Tennessee Code Annotated section 63-10-204(39)(A), which defines the "practice of pharmacy[,]" does not contain a prohibition on making a medical diagnosis.[11] The statute does not render a pharmacist *ipso facto* incompetent to express any opinion on causation for purposes of satisfying section 29-26-115(b) when the pharmacist's expert opinion is otherwise admissible and relevant. *See* Tenn. R. Evid. 702. The question remains, however, as to whether Mr. Lander was qualified to offer the specific opinion at issue in this appeal—that the negligence of the Pharmacy Defendants was the sole or substantial factor in Ms. Grimes' death.

A review of the opinions contained in Mr. Lander's affidavit is helpful to our analysis:

> 6. Upon a standard of reasonable medical certainty and upon a further causation standard of "more probable than not," I express the following specific opinions:
>
> > (a) Doris Ann Holt Grimes died on November 21, 2014 as a primary result of a delayed diagnosis of an apparent acute gastrointestinal bleed. Such internal bleeding is a recognized and routine risk

---

[11] Tennessee Code Annotated section 63-10-204(39)(A) states:

(39)(A) "Practice of pharmacy" means a patient-oriented health service profession in which pharmacists interact and consult with patients and other health care professionals to enhance patients' wellness, prevent illness, and optimize outcomes. The practice involves:
(i) Interpretation, evaluation and implementation of medical orders and prescription orders;
(ii) Responsibility for compounding and dispensing prescription orders, including radioactive substances;
(iii) Participation in drug, dietary supplement and device selection, storage, distribution and administration;
(iv) Drug evaluation, utilization or regimen review;
(v) Maintenance of patient profiles and other pharmacy records;
(vi) Provision of patient education and counseling;
(vii) Provision of patient care services and activities pursuant to a collaborative pharmacy practice agreement;
(viii) Drug or drug-related research; and
(ix) Those professional acts, professional decisions or professional services necessary to maintain all areas of a patient's pharmacist-provided care;

associated with the administration of Pradaxa and similar blood-thinning agents to any patient, resulting in the need for heightened education of the patient regarding those risks by both an administering doctor and a dispensing pharmacist.

(b) The alleged administering pharmacist, James Dickerson, individually and on behalf of his employer, Rite Aid Pharmacy, breached the acceptable standard of professional practice by failing to document and confirm that both detailed verbal and written warnings were provided to Ms. Grimes at the time of the filling of the prescription for her on October 7, 2014.

(c) Particularly with a drug that contains heightened, irreversible and serious side-effect risks, the pharmacist should document (by the patient's signature or otherwise) the dispensing of accurate risk information pertaining to a drug such as Pradaxa. The forwarding by Rite Aid pharmacy of that information approximately three weeks after the prescription has been filled is not adequate, and constitutes a breach of the acceptable standard, which directly caused the symptoms that led to the death of Doris Ann Holt Grimes.

Parsing Mr. Lander's testimony, we conclude that he offers two relevant causation opinions: (1) that Ms. Grimes died "as a primary result of a delayed diagnosis of an apparent acute gastrointestinal bleed"; and (2) that the Pharmacy Defendants "directly caused the symptoms that led to the death of [Ms.] Grimes."

Thus, Mr. Lander based his causation testimony on the fact that there was an alleged delayed diagnosis of internal bleeding and that the lack of informed consent given by the Pharmacy Defendants "directly" caused the "symptom" that led to Ms. Grimes' death. As an initial matter, we fail to see how a pharmacist is able to opine that a delayed diagnosis occurred in this case. Even setting that issue aside, however, we cannot conclude that the trial court abused its discretion in excluding this testimony as outside the expertise of a pharmacist.

Here, there is no dispute that in addition to the bleeding problems allegedly caused by the administration of Pradaxa, Ms. Grimes was also suffering from cancer that spread to her liver.[12] Moreover, there was no dispute that Ms. Grimes suffered from a stroke, though the type of stroke that Ms. Grimes suffered was sharply disputed. According to the undisputed facts on this claim, various medical doctors considering these undisputed facts

---

[12] Although this was not among the undisputed facts submitted in support of the Pharmacy Defendants' motion for summary judgment, Ms. Grimes cancer diagnosis was mentioned several times in the complaint.

had come to different conclusions regarding the causes of Ms. Grimes' death.

In order to opine that Ms. Grimes' cause of death was a result of the Pharmacy Defendants' failure to give Ms. Grimes appropriate warnings, Mr. Lander was required to tie Ms. Grimes' death to her use of Pradaxa (and to the Pharmacy Defendants' failure to give her timely and adequate warnings). Indeed, Tennessee law on causation requires that "'that the injury or harm would not have occurred 'but-for' the defendant's negligent conduct.'" *King v. Anderson Cty.*, 419 S.W.3d 232, 246 (Tenn. 2013) (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn.1993)). Thus, Plaintiff must submit competent expert proof that Ms. Grimes' death would not have occurred "but for" the negligence of the Pharmacy Defendants. In this particular case, in order to state the cause-in-fact of Ms. Grimes' death, it was therefore necessary for her expert to (1) determine what type of stroke Ms. Grimes experienced and whether the stroke was caused by Pradaxa;[13] (2) conclude that the injuries were not simply the result of the Pradaxa, but specifically the Pharmacy Defendants' failure to give adequate and timely warnings; and (3) exclude Ms. Grimes' cancer or other factors as the primary cause of death. *Cf. Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (stating that a causation opinion based on a differential diagnosis is reliable where the doctor, *inter alia*, "engages in 'standard diagnostic techniques by which doctors normally rule out alternative causes to reach a conclusion as to which cause is most likely'" (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 760 (3d Cir. 1994)). In other words, to state that the Pharmacy Defendants' negligence was the "but for" cause of Ms. Grimes' injuries necessarily required Mr. Landers to "rule out" her other conditions to determine that her injuries would not have occurred without the Pharmacy Defendants' failure to give timely and adequate warnings.

Unfortunately, Mr. Lander's affidavit provides no information as to how his education and experience as a pharmacist makes him competent to opine as to the cause of a patient's stroke or to rule out other possible causes for her death. In the absence of such information, we decline to assume that a pharmacist has the education and experience to offer opinions on this particular issue. In short, this is a complex case wherein Ms. Grimes was found to have a multitude of issues all bearing down on her in the weeks prior to her death. Mr. Lander, however, has not shown via his affidavit that he is competent to express an opinion as to the cause of Ms. Grimes' death in light of this complex medical situation. As such, Plaintiff has not demonstrated that the trial court abused its discretion in excluding Mr. Lander's causation proof. In the absence of competent expert proof on causation, the trial court did not err in granting summary judgment to the Pharmacy Defendants on Plaintiff's claim that they caused her death. We therefore dismiss Plaintiff's claims against the Pharmacy Defendants in their entirety.[14]

---

[13] Mr. Lander states in his affidavit that he reviewed Ms. Grimes' medical records, which contain a notation that Ms. Grimes' stroke was "embolic." According to Dr. Axelbank's later testimony, a hemorrhagic stroke is the type of stroke that results from the over-administration of blood thinner.

[14] We note that with regard to the Defendants Doctors, the trial court characterized Plaintiff's claims as involving death, hastening of death, and pain and suffering. The trial court characterized Plaintiff's claim

**B. Grant of Partial Summary Judgment to Defendant Doctors**

We now turn to the second issue raised by the Appellant; whether the trial court erred in granting partial summary judgment to the Defendant Doctors. In our review, it appears that the trial court and the parties have generally divided the claims into the following inter-related claims of negligence: (1) lack of informed consent; (2) death, hastening of death, and pain and suffering; and (3) other rulings. We will consider each type of claim in turn.

In order to determine the correctness of the trial court's rulings, "we must determine first whether factual disputes exist" and whether any disputed facts are material to the claim or defense upon which the summary judgment is predicated. ***Summers v. Cherokee Children & Family Servs., Inc.***, 112 S.W.3d 486, 508 (Tenn. Ct. App. 2002). In our *de novo* review, we therefore begin with the statement of undisputed material facts. Defendant Doctors' statement contains appropriate citations to the record, specifically, the complaint, the Plaintiff's expert witness disclosures, the affidavit and deposition of Dr. Axelbank, the deposition of Mr. Lander, and the affidavit of Dr. Christopher Willey, a radiation oncologist.

Of the thirty-two statements, Plaintiff disputed twelve, relying on the deposition and supplemental affidavit of Dr. Axelbank, the "medical chart," and the affidavit of Ms. Kidd to establish disputed material facts. Three responses by the Plaintiff were not supported by citation to the record;[15] we therefore consider them to be undisputed. Tenn. R. Civ. P.

---

against the Pharmacy Defendants as involving only a claim that they were responsible for her death. We agree. Nothing in Plaintiff's complaint speaks specifically to any pain and suffering experienced by Ms. Grimes as being attributable to the Pharmacy Defendants. Moreover, nothing in Mr. Lander's affidavit states that Ms. Grimes' pain was caused by the Pharmacy Defendants' negligence. Indeed, Plaintiff's other expert, Dr. Axelbank, attributes Ms. Grimes' pain to the negligence of the Defendant Doctors. Thus, the trial court correctly characterized the claim against the Pharmacy Defendants as involving only a claim related to Ms. Grimes' death.

[15] Plaintiff responded to Statements 10, 25, and 32 as follows:

10. It is more likely than not that Ms. Grimes' stroke which led to her ultimate death was an embolic stroke. (Depo. of Arthur Axelbank, M.D., p. 84, 11. 7-18).

RESPONSE: Denied (see quotes set forth in the brief, stating the opposite, and as referenced above).

\* \* \*

25. Dr. Axelbank can point to no reliable evidence that any phone calls were made to FHG prior to October 20, 2014, regarding Ms. Grimes having black tarry stools. (Depo. of Arthur Axelbank, M.D., p. 89, ll. 9-21).

56.03; ***Duncan***, 2005 WL 1996624, at \*5 ("Merely informing the trial court that the record demonstrates disputed facts, without specifically addressing those facts in the response and specifically citing to portions of the record evidencing dispute, does not satisfy Rule 56. Any fact not *specifically* disputed *with* citations to the record to support the alleged dispute may be deemed admitted." (emphasis in original)).

Of the remaining responses, the following facts were undisputed and material to the issues we address:

- Plaintiff pursued a claim of medical negligence;
- Plaintiff alleged that the defendants' negligence proximately and directly led to Ms. Grimes' death due to loss of blood following a prescription for Pradaxa;
- Dr. Axelbank was the Plaintiff's only expert witness who would testify regarding the standard of acceptable professional practice applicable to the

---

RESPONSE: Denied, as "reliable evidence" is based upon a hearsay legal lecture provided to Dr. Axelbank by Mr. Miles.

\* \* \*

32. Ms. Grimes more likely than not would have died sooner than she did had she not received Pradaxa or had it been discontinued sooner than it was; in other words, her continued use of Pradaxa did not hasten her death, but more probably than not prolonged her life. (Affidavit of Christopher Willey, M.D. at ¶¶ 5- 7).

RESPONSE: Plaintiff has received no affidavit by Dr. Willey, only a Rule 26 Disclosure. Denied, based upon the brief legal issues describing the absence of any factual or technical foundation to an unsupported conclusion, patently inadequate under the requirements of Rule 26 of the Tennessee Rules of Civil Procedure and Rule 703 of the Tennessee Rules of Evidence.

Dr. Willey's affidavit was filed with the materials supporting Defendant Doctors' renewed motion for summary judgment and is present in the technical record on appeal. The renewed motion, Rule 56.03 statement, brief in support, and notice of filing of materials supporting the renewed motion, with its clearly-labeled and enumerated exhibits including Dr. Willey's affidavit, all state in their certificates of service that they were served on Plaintiff's counsel on February 26, 2018. These documents, which span approximately 306 pages, were all filed with the trial court on March 1, 2018. Plaintiff filed her response to the Defendant Doctors' Rule 56.03 statement on March 28, 2018. Although we concede that the documents submitted containing Dr. Willey's affidavit were voluminous, Plaintiff did not respond to these statements of fact by seeking more time to review the documents and made no effort to respond in any fashion to the factual allegations contained therein by pointing to specific facts in the record that dispute Dr. Willey's conclusion. Thus, this response does not establish a disputed material fact and we take it as admitted for purposes of this appeal. *See **Duncan v. Lloyd***, No. M2004-01054-COA-R3-CV, 2005 WL 1996624, at \*5 (Tenn. Ct. App. Aug. 18, 2005).

18

Defendant Doctors and Plaintiff's only expert qualified to testify regarding Ms. Grimes' cause of death;[16]

- A stroke that is the result of blood clotting is called an "embolic stroke";
- Dr. Farmer prescribed Pradaxa; his decision to prescribe Pradaxa for Ms. Grimes' blood clot in the dosage he did complied with the recognized standard of acceptable professional practice;
- A reasonable person in Ms. Grimes' situation would take Pradaxa as prescribed because of the severe risk that clotting posed to her life;
- Dr. Axelbank did not express an ultimate opinion on the question of whether Ms. Grimes' death was hastened by her bleeding issue, but stated that he would defer to the opinion of an oncologist on this question;
- Despite Dr. Ball ordering a one-month follow-up appointment after Ms. Grimes' October 13 visit, she had a one-week follow-up appointment, which would have been an acceptable follow-up period within the standard of care;
- There is no evidence in the medical chart that Dr. Farmer, Dr. Ball, or Ms. Frierson was ever aware of Ms. Grimes' gastrointestinal bleeding issue or that she was having black tarry stools;
- The doctors at Maury Regional Medical Center were successful in controlling and stopping Ms. Grimes' gastrointestinal bleeding;
- Dr. Axelbank is not an expert regarding Ms. Grimes' life expectancy.

With respect to the remaining statements, Plaintiff disputed nine statements with appropriate citation to the record; in her denial of two of those statements, Plaintiff relied upon her own affidavit. We will examine the evidence relied upon to dispute those two statements first, as the admissibility of the evidence upon which the statements are based are raised in this appeal.

**1. Admissibility of Hearsay Statements contained in Ms. Kidd's Testimony**

Plaintiff disputed the following two alleged facts by reference to her own affidavit:

19. Ms. Grimes did not present to FHG on October 13, 2014, due to any symptoms related to taking Pradaxa, but instead presented on this date as it was a scheduled follow-up appointment from her October 7, 2014 office visit. (Depo. of Arthur Axelbank, M.D., p. 71, 11. 6-10).

RESPONSE: Denied (see medical chart, brief attachments and Affidavit of Teresa Grimes Kidd).

---

[16] As noted, *supra*, Plaintiff does appear to rely on Mr. Lander to support his claims against the Pharmacy Defendants. However, there is no dispute that Dr. Axelbank is Plaintiff's only cause of death expert with regard to Plaintiff's claims against the Defendant Doctors.

20. There is no evidence in the medical record that Ms. Grimes had any complaints of black tarry stools or blood in her stool when she presented to FHG on October 13, 2014. (Depo. of Arthur Axelbank, M.D., p. 71, ll. 11-19).

RESPONSE: Denied (see medical chart excerpts, highlighted, referencing the patient's description of the onset of symptoms that led her to return quickly after October 13; and see Affidavit of Teresa Grimes Kidd).

Statements 19 and 20 are properly supported by the cited testimony of Dr. Axelbank. The vague references to the record in Plaintiff's responses do not meet the requirements of Rule 56.03 ("Each disputed fact must be supported by specific citation to the record."). We will not infer a disputed issue of material fact based on the reference to the mere existence of these three items.[17]

Despite these shortcomings in the Plaintiff's responses, the trial court soldiered on and, in determining whether any competent evidence existed to show that any complaints of symptoms of blood loss were communicated to any of the Defendant Doctors prior to October 20, 2014, ruled that Ms. Kidd's deposition contained some hearsay statements that were inadmissible while others were admissible.[18] Both parties argue in the body of their briefs that the trial court erred in ruling against them. Plaintiff contends that all statements should have been admissible, including statements from Ms. Grimes to Plaintiff as to what Ms. Grimes told medical staff. The Defendant Doctors, however, argue that statements overheard by Plaintiff on phone calls purportedly between Ms. Grimes and medical staff should be inadmissible where Plaintiff cannot identify the individual with whom Ms. Grimes' spoke.

The problem with both these arguments, however, is that neither was specifically designated as an issue in this case. Here, Plaintiff raised only the general issue that the trial court incorrectly granted partial summary judgment to the Defendant Doctors. And the Defendant's Doctors' only issue specifically addressed to the trial court's evidentiary rulings states that the "trial court appropriately ruled that Plaintiff's hearsay statements are inadmissible[.]" Similar to Plaintiff, the Defendant Doctors' affirmative issues are only broadly directed to the trial court's denial of some of their requests for summary judgment.

---

[17] The medical chart spans 23 pages, and Ms. Kidd's affidavit contains 24 paragraphs of information and spans 9 pages. Plaintiff does not explain in her brief or refer to the exact nature or location in the record of the "brief attachments."

[18] At the time of the hearing on the Defendant Doctors' renewed motion for summary judgment, numerous motions *in limine* had also been filed by the Defendant Doctors, which were to be heard on July 6, 2018. One of those motions *in limine* requested the trial court prohibit Plaintiff or other witnesses from offering any hearsay testimony and specifically referenced the statements quoted above that were considered by the court.

20

*See* **Forbess v. Forbess**, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) (holding that an appellee is held to the same standard as an appellant when it requests affirmative relief on appeal).

Rule 27(a) of the Tennessee Rules of Appellate Procedure mandates that the appellant's brief contain, under appropriate headings, "[a] a statement of the issues presented for review[.]" Tenn. R. App. P. 27(a)(4); *see also* **Forbess v. Forbess**, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) (holding that an appellee is held to the same standard as an appellant when it requests affirmative relief on appeal). Subject to some exceptions not present here, "[r]eview generally will extend only to those issues presented for review." Tenn. R. App. P. 13(b). It is therefore well-settled that an issue is generally waived when it is argued in the body of the brief, but not designated as an issue on appeal. *See, e.g.*, **State v. Freeman**, 402 S.W.3d 643, 653 (Tenn. Ct. App. Oct. 16, 2012) ("Generally, an issue argued in the body of the brief, but not designated as an issue will be considered waived"); **Bunch v. Bunch**, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008); **Childress v. Union Realty Co.**, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002).

The Tennessee Supreme Court has opined on the specificity required of the designated issues:

> [A] properly framed issue may be the most important part of an appellate brief. Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 83 (2008); David E. Sorkin, *Make Issue Statements Work for You*, 83 Ill. B.J. 39, 39 (Jan. 1995).
> Rather than searching for hidden questions, appellate courts prefer to know immediately what questions they are supposed to answer. Bryan A. Garner, *Garner on Language and Writing* 115 (2009); Robert L. Stern, *Appellate Practice in the United States* § 10.9, at 263 (2d ed.1989). Accordingly, "[a]n effectively crafted issue statement will define the question to be considered and begin disposing the court to decide in the client's favor." Judith D. Fischer, *Got Issues? An Empirical Study About Framing Them*, 6 J. Ass'n Legal Writing Directors 1, 25 (2009); *see also* **State v. Williams**, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995) (stating that "[e]ach issue should . . . relate the conclusion that the party wants the appellate court to reach"); Karl N. Llewellyn, *A Lecture on Appellate Advocacy*, 29 U. Chi. L. Rev. 627, 630 (1962) (stating that "the  first thing that comes up is the issue and the first art is the framing of the issue so that if your framing is accepted the case comes out your way").
> Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); **State v. Bledsoe**, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be oriented toward a statement of the issues presented in a case and the arguments in

support thereof." Tenn. R. App. P. 27, advisory comm'n cmt. . . . The issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver. *Fahey v. Eldridge*, 46 S.W.3d 138, 143-44 (Tenn. 2001); *State v. Williams*, 914 S.W.2d at 948.

*Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). Where litigants do not raise issues specifically, they may be waived. *See, e.g., Sprunger v. Cumberland Cty., TN Sheriff's Office*, No. E2016-02572-COA-R3-CV, 2017 WL 3206600, at *4 (Tenn. Ct. App. July 27, 2017) (waiving an issue where it was not designated as an issue with specificity). We may, however, exercise our discretion to consider issues not properly designated. *See, e.g.*, *Hodge*, 382 S.W.3d at 335; *State ex rel. Gibbons v. Smart*, No. W2013-00470-COA-R3-CV, 2013 WL 5988982, at *6 (Tenn. Ct. App. Nov. 12, 2013) ("While we would normally consider the due process issue waived because it is not specifically stated, because the Trustee's issue is so broadly worded we will exercise our discretion to address the due process argument in the interest of full adjudication of this case. However, we discourage this practice and encourage parties to always state their issues as specifically as possible in compliance with Tennessee Rule of Appellate Procedure 27(a)(4).").

Here, both parties seek affirmative relief regarding portions of the trial court's evidentiary rulings. Neither party, however, designated as an issue their contention that the trial court abused its discretion with regard to any evidentiary ruling. Rather, the affirmative issues raised by the parties deal only broadly with the trial court's summary judgment decisions. As we have previously stated, "[c]laiming [only] that the trial court erred in granting summary judgment does not provide the specificity that the Tennessee Rule of Appellate Procedure 27 envisions." *Sprunger*, 2017 WL 3206600, at *4; *see also Cartwright v. Jackson Capital Partners, Ltd. P'ship*, 478 S.W.3d 596, 616 (Tenn. Ct. App. 2015) (holding that the appellant waived a challenge to the trial court's evidentiary ruling by only designating the trial court's grant of summary judgment as an issue on appeal); *cf. Woodgett v. Vaughan*, No. M2016-00250-COA-R3-CV, 2016 WL 7220508, at *3 (Tenn. Ct. App. Dec. 13, 2016) (holding that party waived an issue as to whether evidence was properly excluded in arguing only that the trial court erred in finding no evidence to support the claim). Thus, both parties' arguments that the trial court erred in its evidentiary rulings are waived on appeal.[19] We will therefore consider the relevant testimony of Plaintiff only as deemed admissible by the trial court for purposes of this appeal.

The relevant portions of the deposition testimony of Ms. Kidd relied on by the parties are as follows, with the bolded portions ruled to be admissible by the trial court:

---

[19] We note that, in an abundance of caution, we reviewed the trial court's evidentiary rulings and cannot conclude that either party has shown that the trial court abused its discretion in its ruling. *See State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) ("Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion and will not be disturbed on appeal unless the trial court abused its discretion.").

Q. Okay. Were you ever with your mother at the time she made phone calls to her doctor during the periods related to this lawsuit?
A. Yes.
Q. All right. Which times were you there with her when she made a call?
**A. Okay. October the 10th, she called Family Health Group. And that was shortly after she started taking the Pradaxa on October 7th. And by two days later, certainly by the 10th, she was telling me how sick she was at her stomach.** She was very nauseated. Her stomach was burning. She didn't want anything to eat. And I asked her if that could be something that the medicine could be causing. Of course she didn't know. She had not received any warnings about the medicine causing that.

And so I recommended that she call the office. Let them know that she was having -- she was sick at her stomach and to alert them that she was having problems and to see if that could be a result of the medication.

Now, I did not -- I could not hear their side of the conversation. **I can only hear her side. But I did hear her tell them what she had told me about the way she was feeling, and how nauseated she was, and her stomach was burning. And she confirmed with them that she had an appointment -- a follow-up appointment with Dr. Ball on October 13th.**

\* \* \*

Q. All right. Did you observe any other phone calls your mother made to Family Health Group in October of 2014?
A. . . . October 15th is when -- again, October 10th is when -- or -- **actually, the day before, October 9th, was the first day that she mentioned to me about feeling sick and the burning in her stomach. . . .** Then on October the 13th was a Monday. She went -- that's when she had the appointment with Dr. Ball. **By that point, October the 13th, she told that she had noticed -- within the last day or so, o[r] that weekend, I think that when she went to the bathroom that her stool was unusually black.**

\* \* \*

[Excerpt of deposition included in the appellate record does not contain the question that preceded the following answer:]
A. . . . **by that time she had already observed -- like I said, around October the 12th -- 11th, 12th, is when she started observing the blood in her stool**. . . . She knew that her stool was very black and tarry. She said when she met with Dr. Ball on October 13th, she, you know, told him about that. An[d] she had also noticed by that time that she was feelin[g] weak and tired.

23

\*    \*    \*

[Excerpt of deposition included in the appellate record does not contain the question that preceded the following answer:]
A. . . . besides being weak, **she also told me on the 17th that she was feeling dizzy a[nd] she was having some shortness of breath. And that wa[s] on the 17th.**

\*    \*    \*

Q. So what was the plan of action for her at that point, if there was one?
A. . . . I just heard her on October 17th talking -- because she did call the doctor's office. I don't know who she talked with. But I told her she needed to let them know that she was feeling dizzy and having shortness of breath, and, you know, some of the new things that were happening. . . . That's when she first really mention[ed to] me that she noticed that her blood pressure had dr[opped] from what it normally was. And also that her pulse [was] much faster. . . . I told her she needed to relay that to the doctors.
     And she said, "Well, I've got an appointment on Monday."
And I even asked her, I said, "Do you need to go to the doctor before then?"
And I told her, I said, "If you feel like you need to go to the doctor before then or to the emergency room," I said, "you know, we'll go to the emergency room."
     And she told me, "No."

To summarize, the trial court ruled that the statements of Ms. Grimes to Ms. Kidd that Ms. Grimes had black tarry stools as of October 11 or 12 and that she was feeling weak, dizzy, and having some shortness of breath as of October 17 were admissible under Rule 803(3) of the Tennessee Rules of Evidence.[20] The trial court ruled admissible, pursuant to Rule 803(4) of the Tennessee Rules of Evidence,[21] the testimony of Ms. Kidd that she heard her

---

[20] Rule 803(3) provides an exception to hearsay as follows:

**Then Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The advisory committee comments make clear that "the declaration need not be made to a doctor; any witness who overheard the hearsay statement could repeat it in court under this exception." Tenn. R. Evid. 803(3) adv. comm'n cmt.

[21] Rule 803(4) provides an exception to hearsay as follows:

**Statements for Purposes of Medical Diagnosis and Treatment.** Statements made for

24

Mother tell someone at Family Health Group during an October 10 phone call that she was nauseated and that her stomach was burning.

Though Ms. Kidd testified that Ms. Grimes told her that she had communicated her symptoms to Dr. Ball during her appointment at Family Health Group on October 13, the trial court concluded that the statement was inadmissible hearsay. The trial court also ruled inadmissible any statements Ms. Kidd purportedly heard her mother communicate to Family Health Group on October 17, as Ms. Kidd testified that her mother called the doctor's office that day and that she "heard her" mother "talking," but Ms. Kidd did not testify about any specific statements her mother made during her October 17 telephone call.

Ms. Grimes' medical records do not contain any entry of symptoms indicative of blood loss that she purportedly told her daughter she was experiencing, i.e., nausea and stomach burning, until her October 20 appointment with Nurse Frierson, who recorded in the chart that the patient complained of "palpitations," "chest pain . . . associated with generalized weakness, lightheadedness, S[hortness] O[f] B[reath] and nausea."

Plaintiff did not rely solely on her deposition testimony to dispute these facts, but also her own affidavit. In particular, Plaintiff asserts that proof that Ms. Grimes communicated the "red flag" symptoms to Family Health Group is contained in Ms. Kidd's affidavit. It is true that Ms. Kidd's affidavit states the following: "I know that my mother telephoned the Family Heath Group office on October 10, 2014 to advise her doctors about the nausea and blood in her stool."[22] Again, pursuant to the trial court's evidentiary rulings, Ms. Kidd's testimony as to what she overheard her mother inform Family Health Group were admissible,[23] because Ms. Kidd's deposition confirms that she did actually overhear the October 10, 2014 conversation.

The problem with Ms. Kidd's assertion that she overheard Ms. Grimes communicate the blood in her stool to Family Health Group on October 10, 2014, is that Ms. Kidd later

---

purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

[22] Ms. Kidd's affidavit contains no other specific statements concerning overheard communications of "red flag" symptoms to Family Health Group, other than a vague reference to Plaintiff's knowledge that her mother "again called doctors during that timeframe to report the progressing symptoms." Nothing concerning the October 17 phone call, the only other phone call that Ms. Kidd testified that she overheard, was specifically mentioned in the affidavit.

[23] As previously discussed, Ms. Kidd's testimony also includes statements that Ms. Grimes purportedly told Ms. Kidd as to Ms. Grimes's conversations with Family Health Group that were not overheard by Ms. Kidd. The trial court deemed that testimony inadmissible. As such, we will not discuss those statements in Ms. Kidd's affidavit.

25

admits that her mother did not develop these symptoms as of that date. Rather, Ms. Kidd repeatedly testified in her deposition that Ms. Grimes did not develop these symptoms until the weekend following the October 10 phone call. For example, Ms. Kidd testified that "around October the 12th -- 11th, 12th, is when she started observing the blood in her stool." Ms. Kidd further explained that following the Friday, October 10 phone call, "over that weekend is when she first mentioned to me a concern about her stools being black." Ms. Kidd's affidavit testimony if therefore directly contradictory to her later deposition. Yet, Plaintiff offers no explanation for this contradiction. *Cf.* **Church v. Perales**, 39 S.W.3d 149, 169 (Tenn. Ct. App. 2000) ("Tennessee follows the rule that contradictory statements by the same witness regarding a single fact cancel each other out. The Tennessee Supreme Court has characterized mutually contradictory statements by the same witness as "no evidence" of the fact sought to be proved. However, in order to be disregarded under the so-called cancellation rule, the allegedly contradictory statements must be unexplained and neither statement can be corroborated by other competent evidence." (internal citations omitted)).

As previously discussed, summary judgment is not appropriate if there are genuine issues of material fact in dispute. **Rye**, 477 S.W.3d at 264–65. "A disputed fact presents a genuine issue if 'a reasonable jury could legitimately resolve that fact in favor of one side or the other.'" **Martin v. Norfolk S. Ry. Co.**, 271 S.W.3d 76, 84 (Tenn. 2008) (quoting **Byrd v. Hall**, 847 S.W.2d 208, 215 (Tenn. 1993)). In this case, no reasonable jury could conclude that Ms. Grimes communicated her bloody stool to Family Health Group on October 10 when the testimony of Plaintiff was that she did not develop this symptom until the following day at the earliest. We therefore conclude that this portion of the affidavit is insufficient to create a genuine issue of material fact in dispute. As a result, Plaintiff's experts were not entitled to rely on this portion of Ms. Kidd's affidavit in forming their opinions. *See* **Horton v. Mountain Life Ins. Co.**, No. 03A01-9809-CV-00287, 1999 WL 172649, at *2 (Tenn. Ct. App. Mar. 24, 1999) (citing **Byrd**, 847 S.W.2d at 215–16) ("At this juncture in the proceedings, those opinions-based as they are on facially contradictory testimony-are inadmissible and cannot be considered by us on summary judgment.").

In sum, upon our review of the deposition testimony of Ms. Kidd and her affidavit, we agree with the trial court that Ms. Kidd did not put on admissible, reliable proof that Ms. Grimes actually communicated that she was experiencing tarry black stools, weakness, or shortness of breath — which Plaintiff characterizes as "red flag" symptoms of blood loss — to Family Health Group or its physicians on or before October 20. Hence, the Plaintiff has failed to establish a genuine dispute of material fact with respect to statements 20 and 25 of the Defendant Doctors' Rule 56.03 statement. We thus conclude that it is undisputed that Ms. Grimes presented to Family Health Group on October 13, 2014 for a scheduled follow-up appointment from her October 7 office visit and that there is no admissible evidence that Ms. Grimes relayed any complaints of black tarry stools or blood in her stool to her healthcare providers at that time.

Keeping in mind these and the other undisputed material facts, we now turn to address the parties' contentions regarding the trial court's grant of partial summary judgment in this case.

## 2. Informed Consent

To prevail on an informed consent claim, "the plaintiff must prove: '(1) what a reasonable medical practitioner in the same or similar community would have disclosed to the patient about the risk posed by the proposed procedure or treatment; and (2) that the defendant departed from the norm.'" ***Bogner v. Vanderbilt Univ.***, No. M2015-00669-COA-R3-CV, 2017 WL 716011, at *7 (Tenn. Ct. App. Feb. 23, 2017) (quoting ***Ashe v. Radiation Oncology Assocs.***, 9 S.W.3d 119, 121 (Tenn. 1999) and citing Tenn. Code Ann. § 29-26-118 (2012)). Tennessee Code Annotated section 29-26-118 states:

> In a health care liability action, the plaintiff shall prove by evidence as required by § 29-26-115(b)[24] that the defendant did not supply appropriate information to the patient in obtaining informed consent (to the procedure out of which plaintiff's claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which the defendant practices and in similar communities.

"Typically, the health care provider must 'inform the patient of the diagnosis or nature of the patient's ailment, the nature of and reasons for the proposed treatment or procedure, the risks or dangers involved, and the prospects for success.'" ***Miller ex rel. Miller v. Dacus***, 231 S.W.3d 903, 907–08 (Tenn. 2007) (quoting ***Shadrick v. Coker,*** 963 S.W.2d 726, 732 (Tenn.1998)). "Whether the information given to the patient is sufficient to satisfy the statutory standard 'depends on the nature of the treatment, the extent of the risks involved, and the standard of care.'" ***Miller***, 231 S.W.3d at 907–08 (quoting ***Cardwell v. Bechtol***, 724 S.W.2d 739, 749 (Tenn. 1987)). "In an informed consent case, 'the inquiry focuses on whether the doctor provided *any* or *adequate* information to allow a patient to

---

[24] Tennessee Code Annotated section 29-26-115(b) reads:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

formulate an intelligent and informed decision when authorizing or consenting to a procedure.'" ***Bogner v. Vanderbilt Univ.***, No. M2015-00669-COA-R3-CV, 2017 WL 716011, at \*6 (Tenn. Ct. App. Feb. 23, 2017) (quoting ***Blanchard v. Kellum***, 975 S.W.2d 522, 524 (Tenn. 1998) (emphasis in original)).

Causation, as in all healthcare liability cases, is an essential element of a claim premised on lack of informed consent. ***Bogner v. Vanderbilt Univ.***, No. M2015-00669-COA-R3-CV, 2017 WL 716011, at \*10 (Tenn. Ct. App. Feb. 23, 2017) (citing ***Shadrick v. Coker***, 963 S.W.2d 726, 732 (Tenn. 1998); ***Clifford v. Tacogue***, No. M2009-01703-COA-R3-CV, 2010 WL 2712534, at \*4 (Tenn. Ct. App. July 8, 2010)) ("It has long been the law in Tennessee that, whether a plaintiff seeks recovery under a medical battery or an informed consent theory, the plaintiff must establish causation."). In an informed consent case, "the standard to be applied . . . is whether a reasonable person in the patient's position would have consented to the procedure or treatment in question if adequately informed of all significant perils." ***Ashe v. Radiation Oncology Assocs.***, 9 S.W.3d 119, 120 (Tenn. 1999). The plaintiff is required to prove this causation element "by expert testimony[.]" ***White v. Beeks***, 469 S.W.3d 517, 526 (Tenn. 2015), *as revised on denial of reh'g* (Aug. 26, 2015) (holding that the patient "was required to prove by expert testimony . . . whether a reasonable person in [the patient's] position would have consented to the [treatment] if he had been provided with the information required by the recognized acceptable professional practice").

The parties agreed that the decision to prescribe Pradaxa and the amount prescribed were within the recognized standard of acceptable professional practice as well as that a reasonable person in Ms. Grimes' position would take Pradaxa as prescribed because of the severe risk of clotting; however, they disagree as to whether the doctor provided *any* or *adequate* information to allow a patient to formulate an intelligent and informed decision when authorizing or consenting to a procedure. The following statements of material fact, and Plaintiff's responses thereto, are pertinent to this cause of action:

> 15. There was no lack of informed consent in this case with respect to the delivery of Pradaxa to Ms. Grimes. (Depo. of Arthur Axelbank, M.D., p. 63, 1. 25 — p. 64, 1. 4).

> RESPONSE: Denied (Axelbank Deposition, pp. 139-141; and Supplemental Affidavit of Dr. Axelbank). The context (previous pages) provides no factual detail regarding "informed consent" or its absence. Failure to note the discussion of the potentially deadly drug in the chart of an 82-year-old patient constitutes a per se violation of the medical record requirements of Chapter 0880-2.15 (Medical Records).[25] If it is not in the

---

[25] The complaint does not contain a negligence per se claim. Such a claim is not authorized in the

28

chart, it was not communicated in a material, meaningful way.

16. Dr. Axelbank is not critical of Dr. Farmer for not charting that he had an informed consent discussion with Ms. Grimes regarding Pradaxa. (Depo. of Arthur Axelbank, M.D., p. 169, ll. 2-20).

RESPONSE: Denied, again, the Defendants asked Dr. Axelbank to assume something that is patently missing from the chart, and to further accept that assumption on the basis of what Dr. Farmer claims. Whether or not Dr. Farmer had an important conversation about a potentially deadly drug is an issue of fact. It is undisputed that he did not comply with the law in noting that important conversation in the chart. The predicate "if" invites Dr. Axelbank to assume the truthfulness and accuracy of Dr. Farmer's undocumented claim.[26]

17. Dr. Axelbank has no criticisms of Dr. Farmer in this case. (Depo. of Arthur Axelbank, M.D., p. 70, ll. 1-14).

RESPONSE: As detailed in the brief, the absence of "criticisms" is predicated, in every instance, on the preliminary wording that asks Dr. Axelbank to assume something that is not correct, and each time the question is couched in the terms of that assumption. The problem to that approach is that the assumed facts are disputed facts, as Dr. Axelbank clarifies elsewhere in his deposition, with the exact words quoted for the Court's review. Of course, Dr. Axelbank directly criticizes Dr. Farmer and his staff for medical negligence. The above references (Axelbank Deposition, pp. 139-141) are

---

healthcare liability context:

> In order to prove a violation of the [predecessor to the THCLA], a plaintiff must show that his or her injuries resulted because "the defendant failed to act with ordinary and reasonable care when compared to the customs or practices of physicians from a particular geographic region." ***Sutphin v. Platt***, 720 S.W.2d 455, 457 (Tenn. 1986). In consequence, the locality rule, which the legislature intended to apply to private causes of action for medical malpractice, precludes plaintiffs from proceeding on a negligence per se theory based upon alleged violations of nursing home regulations. *See **Conley** [**v. Life Care Centers of America, Inc.**]*, 236 S.W.3d [713,] 734 [(Tenn. Ct. App. 2007)].

***Estate of French v. Stratford House***, 333 S.W.3d 546, 562 (Tenn. 2011), *superseded by statute on other grounds as recognized by **Ellithorpe v. Weismark***, 479 S.W.3d 818 (Tenn. 2015).

[26] Plaintiff's response to Statement 16 is not properly supported with citation to the record, only argument. However, given its proximity to Statement 15 and the Plaintiff's use of the word "again," we read the two statements together, along with statements 11 through 17, which are also pertinent to the informed consent claim, for full context. Our generosity in this regard should not be construed as our acceptance or condoning of Plaintiff's counsel's failure to comply with Rule 56.03.

29

sharp criticisms of Dr. Farmer, when the predicate, incorrect assumptions about disputed facts are eliminated from the question.

The specific testimony of Dr. Axelbank relied upon by Defendant Doctors in Statements 15 and 16 is the following:

Q. Okay. So with that in mind, can we agree that you don't have any criticisms in this case that there was a lack of informed consent with respect to the delivery of this drug?
A. That's correct.[27]

* * *

Q. But you understood -- you read Dr. Farmer's testimony, understood he said he did discuss with her what the drug was and what some of the side effects were, right?
A. Right.
Q. And you had no criticism of that discussion?
A. Right.
Q. You also understand, don't you, that he was after hours? This was somewhere in the ballpark of 6 to 7 p.m. and away from the chart, right?
A. Yes.
Q. That's the kind of scenario where you would expect that that information might not, ultimately, get to the chart?
A. That's true.

---

[27] Though Defendant Doctors did not cite it to support Statement 15, we note that the series of questions preceding this particular question and answer bear on what Dr. Axelbank was keeping "in mind" as he answered the question; those questions and answers were cited to support Statement 14 (which was admitted by Plaintiff) and are as follows:

Q. And you understand he testified that, paraphrasing, that he discussed concerns about bleeding, to look out for that, right?
A. Right.
Q. We know Ms. Kidd wasn't involved in conversation, correct?
A. There's no evidence for it.
Q. Now, you understood Ms. Kidd's -- well, let me just back up. You've told me already that Ms. Grimes needed to be on this medication given the blood clotting issue, right, or at least some form of blood thinner?
A. Yes.
Q. A reasonable person would not refuse to receive a blood thinner if they were aware of the risk of embolism due to a blood clot, would they?
A. Correct.
Q. Okay. So, certainly, it was reasonable for Dr. Farmer to prescribe it, and it would be expected that a reasonable person such as Ms. [Grimes] would go forward with taking that medication because of the severe risk of clotting to her life?
A. Yes.

30

Q. Okay. And that's – you're not critical of that, are you?
A. No.

To respond to Statements 15 and 17, Plaintiff relied on the following testimony of Dr. Axelbank:

Q. On this issue of whether there was informed consent or not -- and let me -- to be as direct as I can about it, is there a word in this medical chart, is there a word much less a sentence in this medical chart, where Drs. Ball or Farmer indicated to Ms. Grimes and noted in the chart as a proper note of that encounter that they mentioned to her any heightened concerns about Pradaxa or its negative contraindications?
A. No, there's no evidence.
Q. Do you as a component of the standard of acceptable professional practice, particularly when you're dealing with an 80-year-old woman, do you tell that woman, I'm going to give you Pradaxa. If you have any blood in your stools, if you have any heart palpitations, if you have any shortness of breath, you immediately contact me? Do you tell that patient that?
      MR. MILES: Object to the form.
THE WITNESS: Generally, yes.
BY MR. BURGER:
Q. Do you typically generally note that the chart that you've advised that patient of that heightened risk?
A. If I make a note in the chart, it would be -- usually, say, something summative like usual risk to benefits discussed. I may not spell them out each time.
Q. But you note that the risks are discussed?
A. Yes.
Q. Again, anywhere in this chart from beginning to end, from October 7 to October 21, where anyone in the Family Health Group said to this lady, these are the risks that you need to watch for?
A. I didn't see any evidence.
Q. Was that consistent with or inconsistent with the prevailing standard of acceptable professional practice?
A. It's inconsistent.

Plaintiff also relied upon Dr. Axelbank's supplemental affidavit, in which he testified:

4 . . . (b) Definitely, the patient's chart should have reflected notations by Drs. Ball and Farmer that they had discussed with the patient her need to be aware of the risks of the drug, and to promptly report any of those symptoms for a proper response. The chart contains no such entries, and that is a breach of the acceptable standard of professional practice, as my deposition

31

testimony repeatedly clarifies. It was a factor that resulted in unnecessary, extended suffering by Ms. Grimes, and "hastened her death" as described in my deposition.

Dr. Axelbank's testimony illustrates that some facts are in dispute relating to whether Ms. Grimes' chart should have contained an entry indicating that she was informed by the Defendant Doctors of the risks of taking Pradaxa. Plaintiff also attempts to dispute Dr. Farmer's assertion in his deposition that he had an after-hours telephone discussion with Ms. Grimes concerning the medication, as such a call was not noted in Ms. Grimes' chart.[28] However, we conclude that those purportedly disputed facts are not material.

Plaintiff's own expert testified that Ms. Grimes needed to be on this type of medication given her blood clotting issue, that a reasonable person would not refuse to receive a blood thinner if they were aware of the risk of embolism due to a blood clot, that it was reasonable for Dr. Farmer to prescribe it, and that a reasonable person would go forward with taking that medication because of the risk of clotting to her life. Specifically, Dr. Axelbank testified in his deposition as follows:

> Q. A reasonable person would not refuse to receive a blood thinner if they were aware of the risk of embolism due to a blood clot, would they?
> A. Correct.
> Q. Okay. So, certainly, it was reasonable for Dr. Farmer to prescribe it, and it would be that a reasonable person such as Ms. Grimes would go forward with taking that medication because of the severe risk of clotting to

---

[28] Dr. Farmer testified that this discussion took place; however, there is no notation of this call in Ms. Grimes' medical chart. Plaintiff therefore argues that Dr. Axelbank's testimony that he had no criticisms of Dr. Farmer was based on the faulty premise that this discussion indeed took place. But Plaintiff presented no direct proof to dispute Dr. Farmer's testimony. And Dr. Axelbank testified that he could not testify with any certainty that Dr. Farmer did not actually give Ms. Grimes the necessary information, even though the discussion was not noted in Ms. Grimes' chart:

> Q. All right. So in this case, can you reasonably opine that Dr. Farmer did not give Ms. Grimes adequate information about Pradaxa given the information you have?
> A. You know, I don't know. It's not documented, but I think it's -- I don't know.
> Q. Yeah.
> A. It's speculation.
> Q. Right. So you can't reasonably give that opinion, correct?
> A. Right.

In the face of Dr. Farmer's testimony that the discussion took place, the burden shifted to Plaintiff to point to specific facts showing a genuine dispute. *Rye*, 477 S.W.3d at 264–65. Plaintiff did not meet this burden. *Cf. **Omni Aviation v. Perry***, 807 S.W.2d 276, 281 (Tenn. Ct. App. 1990) (citing ***Merit Motors, Inc. v. Chrysler Corp.***, 569 F.2d 666 (D.C. Cir. 1977)) (holding that summary judgment is not precluded by an expert's opinion that is based on speculation). As such, Dr. Axelbank's standard of care opinions that were based on the assumption that this conversation indeed took place may properly be considered in this appeal.

her life?

A. Yes.

The undisputed proof therefore establishes that a reasonable person in Ms. Grimes' position "would have consented to the procedure or treatment in question" even "if adequately informed of all significant perils." *Ashe*, 9 S.W.3d at 120. Thus, the evidence fails to show that even if given adequate information concerning the risks, a reasonable person "would have chosen a different course of treatment." *Id.* at 124. In the absence of proof as to this essential element of Plaintiff's claim, we affirm the grant of summary judgment to the Defendant Doctors on the informed consent cause of action.

**3. Whether the Defendant Doctors' Negligence Caused Ms. Grimes' Death, Hastening of Death, and Pain and Suffering**

The other cause of action raised in the complaint against the Defendant Doctors was that their breach of the acceptable standard of professional practice caused the excruciating pain and suffering and death of Ms. Grimes. The Defendant Doctors' motion for summary judgment stated that "Plaintiff has no evidence establishing that these Defendants' alleged negligence caused Plaintiff to suffer injuries which would not otherwise have occurred." To that end, they relied on the following statements of fact, which Plaintiff disputed:

7. Ms. Grimes' death was not caused by the negligence of these Defendants. (Depo. of Arthur Axelbank, M.D., p. 23, ll. 1-4).

RESPONSE: Denied (Axelbank Deposition, pp. 18, 23, 27, 29, 30, 32, 33, 62, 142, 158, and 159; Supplemental Affidavit of Dr. Axelbank).

* * *

9. Embolic strokes are not attributable to loss of blood from taking blood thinners. (Depo. of Arthur Axelbank, M.D., p. 83, 11. 21-24).

RESPONSE: Denied, as stated (Supplemental Affidavit of Dr. Axelbank, clarifying that abrupt stoppage, where not "appreciated" and tapered, resulting in abrupt stoppage and enhanced likelihood of hypercoagulability).

* * *

17. Dr. Axelbank has no criticisms of Dr. Farmer in this case. (Depo. of Arthur Axelbank, M.D., p. 70, ll. 1-14).

33

RESPONSE: As detailed in the brief, the absence of "criticisms" is predicated, in every instance, on the preliminary wording that asks Dr. Axelbank to assume something that is not correct, and each time the question is couched in the terms of that assumption. The problem to that approach is that the assumed facts are disputed facts, as Dr. Axelbank clarifies elsewhere in his deposition, with the exact words quoted for the Court's review. Of course, Dr. Axelbank directly criticizes Dr. Farmer and his staff for medical negligence. The above references (Axelbank Deposition, pp. 139-141) are sharp criticisms of Dr. Farmer, when the predicate, incorrect assumptions about disputed facts are eliminated from the question.

\* \* \*

21. Dr. Axelbank's only standard of care criticism of Dr. Ball is that he ordered a one-month follow-up at Ms. Grimes' October 13, 2014, office visit, instead of monitoring her more closely. (Depo. of Arthur Axelbank, M.D., p. 71, l. 20 — p. 72,l. 2, p. 164,l. 22 — p. 165, l. 16, and p. 167, ll. 4-7).

RESPONSE: Denied (see responses to 16, 17 and 18 above).

\* \* \*

28. Ms. Grimes' outcome would not have changed in any way (i.e., any injury she suffered would not have been avoided) if Ms. Frierson, on October 20, 2014, had ordered blood work, had consulted with a physician, and had planned to see Ms. Grimes again later that day or the next morning. (Depo. of Arthur Axelbank, M.D., p. 118, l. 1 — p. 119, l. 9).

RESPONSE: Denied (see Supplemental Affidavit of Dr. Axelbank referencing the risks of clotting associated with abrupt stoppage).

Plaintiff's responses relied upon the deposition and affidavit of Dr. Axelbank; she did not submit any additional statements of undisputed material fact. We have reviewed her references to the evidence and note that in them, Dr. Axelbank testified that he was ***not*** offering an opinion that Ms. Grimes' ***death*** was caused by the negligence of the Defendant Doctors.[29] Based on this testimony of Dr. Axelbank and the parties' agreement that the

---

[29] Dr. Axelbank engaged in the following colloquy:

Q. Okay. Are you intending in this case to offer an opinion that Ms. Grimes' death was caused by the alleged negligence of my clients?
A. No.

34

doctors at Maury Regional Medical Center were successful in controlling and stopping Ms. Grimes' gastrointestinal bleeding, we conclude that there is no factual dispute that the Defendant Doctors' alleged negligence did not cause Ms. Grimes' death, and affirm the grant of partial summary judgment in that regard.

However, Dr. Axelbank testified that, in his opinion, the Defendant Doctors' negligence in failing to monitor her for signs of gastrointestinal bleeding caused Ms. Grimes' discomfort and may have hastened her death. Specifically, Dr. Axelbank testified that Ms. Grimes "went for several days or a week or two with GI bleeding that was not diagnosed," which "may have hastened her death, because she became so weak and uncomfortable sooner than she would have if it was diagnosed sooner."

A large portion of Dr. Axelbank's deposition testimony was directed toward this claim, which the trial court and the parties referred to as the "hastening of death claim."[30] Defendants assert, however, that a careful review of Dr. Axelbank's deposition undermines the Plaintiff's argument. We need not tax the length of this opinion with a recitation of the relevant testimony on this issue, however, as we conclude that this dispute is resolved by the undisputed material facts admitted by the Plaintiff.

As previously discussed, by virtue of her failure to properly respond to Undisputed Fact 32, it was deemed admitted. This fact states that "Ms. Grimes more likely than not would have died sooner than she did had she not received Pradaxa or had it been discontinued sooner than it was; in other words, her continued use of Pradaxa did not hasten her death, but more probably than not prolonged her life." Moreover, the following is also contained in Plaintiff's response to the Defendant Doctors' statement of undisputed material facts:

18. Dr. Axelbank would defer to the opinion of an oncologist on the

_____

He then stated that he was of the opinion that Ms. Grimes suffered an injury due to the alleged negligence of the Defendant Doctors.

We note, however, that Plaintiff filed a supplemental affidavit from Dr. Axelbank approximately one month prior to the hearing on the renewed summary judgment motion. Therein, Dr. Axelbank offers additional explanation regarding the hastening of death claim and states that the Defendant Doctors "should still bear some responsibility . . . for [Ms. Grimes'] death." The affidavit does not mention or explain Dr. Axelbank's earlier testimony that he was not offering an opinion that the Defendant Doctors caused Ms. Grimes' death. We are therefore loath to conclude that Dr. Axelbanks' supplemental affidavit even conflicts with his prior statement that he would not offer an opinion as to cause of death. To the extent that it should be read as conflicting, however, Dr. Axelbank does not explain the inconsistency; the affidavit therefore cannot be considered. *See* **Sampson v. Wellmont Health Sys.**, 228 S.W.3d 124, 135 (Tenn. Ct. App. 2007) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726, at 448–50 (3d ed.1998)) (discussing the tactic wherein a witness attempts to change his prior deposition testimony with a later-filed affidavit; when there is an unexplained inconsistency, "the affidavit may be disregarded or stricken as sham").

[30] Dr. Axelbank also discussed his opinion on this claim in his supplemental affidavit.

question of whether Ms. Grimes['] death was hastened by her bleeding issue (Depo. Of Arthur Axelbank, M.D., p. 28, 1. 22– p. 29 1. 4).

RESPONSE: Admitted.

Although Plaintiff later filed a supplemental affidavit from Dr. Axelbank, she did not amend her responses to the Defendant Doctors' statement of undisputed material facts. Thus, Plaintiff freely admitted that Dr. Axelbank would "defer" or "yield to the opinion of" an oncologist as to whether the Pradaxa-caused bleeding issues hastened Ms. Grimes' death. *Black's Law Dictionary* 486 (9th ed. 2009) (defining "defer"). Dr. Willey is the only oncologist who has expressed opinions in this case; his opinion was undisputedly that Ms. Grimes' death was not hastened by her use of the drug prescribed by the Defendant Doctors, and, to the contrary, that her continued use of Pradaxa probably prolonged her life.[31] Consequently, we conclude that Plaintiff has not shown a disputed issue of material fact as to whether the use of blood thinners actually hastened Ms. Grimes' death. Accordingly, we affirm the grant of summary judgment on the hastening of death claim.

The trial court denied summary judgment "on the issues of whether or not the Defendants Dr. Charles Albert Ball and the Family Health Group, Inc, caused Ms. Grimes' injury[ or] caused Ms. Grimes suffering." Pertinent to this issue, we have affirmed the trial court's conclusion that there is no admissible evidence that Ms. Grimes communicated symptoms of blood loss during her visit on October 13 or during her October 17 call to the clinic. The medical chart contains the symptoms Ms. Grimes reported in her October 20 appointment, which caused the Nurse Practitioner to order additional tests. Ms. Grimes was taken to the emergency room and admitted to the hospital the following day, and according to the hospital records, "Pradaxa was stopped[,] GI was consulted and she was transfused 3 units P[acked] R[ed] B[lood] C[ell]s," causing her to become stable. Dr. Axelbank testified:

Q. Okay. Are you planning to offer an opinion in this case that Ms. Grimes suffered an injury due to the alleged negligence of my clients?
A. Yes.
Q. All right. What is the injury?
A. The injury, in my opinion, was that she went for several days or a week or two with GI bleeding that was not diagnosed.
Q. So the injury is limited, then, to a several day period where she had some negative effects of a GI bleed?

---

[31] In addition to generally reciting an opinion in line with Statement of Undisputed Fact 32, Dr. Willey's affidavit included a recitation of his undisputed qualifications and competence and opined that "[a]ny suggestion by the Plaintiff or a witness on her behalf that Ms. Grimes' death was caused or hastened by taking Pradaxa and her subsequent gastrointestinal bleed (which was controlled shortly after her admission to Maury Regional Hospital) is incorrect."

A. Yes. And it may have hastened her death, because she became so weak and uncomfortable sooner than she would have if it was diagnosed sooner.

Dr. Axelbank also testified that he was critical of Dr. Ball's one-month follow-up recommendation after the October 13 appointment; he thought a one-week follow up appointment would have been more appropriate. Nevertheless, Ms. Grimes was back in the clinic one week later.

In our view, there are two critical periods of time at issue with regard to this claim: the period of time prior to Ms. Grimes' October 20, 2014 office visit and the period of time beginning with this visit and ending when Ms. Grimes was stabilized.[32] Dr. Axelbank's deposition testimony explains why two different time periods must be considered:

Q. . . . Am I correctly understanding that the only criticisms, then, that you would have of the practice before that October 20th encounter with Ms. Frierson would be if there was a failure to respond to a call complaining of black tarry stools or obvious signs of blood loss that was made by Ms. Grimes?

A. Yes.

As previously discussed, no admissible evidence was submitted that Ms. Grimes indeed communicated these "red flag" symptoms to Family Health Group prior to October 20, and any statement to that effect by Plaintiff in her affidavit cannot be relied upon by Plaintiff's expert. As such, the evidence is insufficient to establish material facts in dispute that Ms. Grimes suffered any injuries as a result of any deviations of the standard of care stemming from the care she received in the clinic prior to October 20. We conclude, however, that the evidence submitted at the summary judgment stage is sufficient to establish that there are material facts in dispute on this claim from the October 20 appointment until her bleeding was stabilized in the hospital.[33] Accordingly, we affirm the denial of summary judgment on the issue of whether the Nurse Frierson caused Ms. Grimes' injury and suffering from the period of October 20 until she was stabilized in the hospital.[34]

---

[32] We end the time period upon stabilization, of course, because summary judgment has already been affirmed as to whether the Defendant Doctors should be liable for Ms. Grimes' death.

[33] We note that Dr. Axelbank did testify that even if Nurse Frierson followed the recognized standard of care, he could not state with certainty that "the outcome would have changed in any way." Considering this evidence in the context of Dr. Axelbank's testimony and in the light most favorable to Plaintiff, Dr. Axelbank's inability to testify that the ultimate "outcome" of Ms. Grimes' injuries would have been different does not necessarily negate his conclusion that she nevertheless suffered pain and suffering as a result of Nurse Frierson's negligence.

[34] The question of whether the Defendant Doctors are vicariously liable for this negligence is discussed, *infra*.

Defendant Doctors assert, however, that any remaining claim that is asserted relating to Ms. Grimes' pain and suffering caused by deviations from the standard of care on or after October 20 are attributable to Nurse Frierson alone. Indeed, it is undisputed that neither Dr. Farmer nor Dr. Ball saw Ms. Grimes on this date or thereafter. In our view, this question implicates the trial court's decision to deny summary judgment on "the issue[] of . . . whether Dr. Ball failed to supervise nurse Frierson beginning October 20, 2014[.]"[35]

We conclude, however, that this claim was not raised in Plaintiff's complaint and cannot survive summary judgment. Importantly, a review of Plaintiff's complaint raises no specific allegation that either Dr. Ball or Dr. Farmer was negligent in his supervision of Nurse Farmer. Although this claim was arguably raised by Dr. Axelbank's deposition,[36] Plaintiff made no effort to amend her complaint in the four months between Dr. Axelbank's deposition and the hearing on Defendant Doctors' motion for summary judgment. There is "no duty on the part of the court to create a claim that the pleader does not spell out in his complaint." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 704 (Tenn. 2002); *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 538 (Tenn. Ct. App. 2012). Even reviewing Plaintiff's complaint in the light most favorable to it, we simply cannot conclude that a negligent supervision tort was alleged.[37]  *Trau-Med*, 71 S.W.3d at 704 (quoting *Donaldson v. Donaldson*, 557 S.W.2d 60, 61 (Tenn. 1977)) ("[T]he complaint must at least 'contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial.'").

Even if this tort was properly pled, we conclude that the undisputed proof does not support it. "Negligent supervision is a recognized tort in this jurisdiction, . . . but it must be shown that the employer was in complete charge of the work being performed by the employee." *Gates v. McQuiddy Office Products*, No. 02A01-9410-CV-00240, 1995 WL 650128, at *3 (Tenn. Ct. App. Nov. 2, 1995) (citing *East Vollentine Courts, Inc., v. Foust*, 376 S.W.2d 320 (Tenn. 1963)). "A plaintiff in Tennessee may recover for negligent . . . supervision . . . of an employee if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness of the job." *Bazemore v. Performance Food Grp., Inc.*, 478 S.W.3d 628, 638–39 (Tenn. Ct. App. 2015) (quoting *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008)). Here, Dr. Axelbank's testimony showed that doctors do not retain complete control of all the work performed by nurse practitioners. Even more importantly,

---

[35] There is no dispute that Dr. Farmer played no part in the supervision of Nurse Frierson.

[36] Dr. Axelbank testified that he had criticisms for whatever doctor was supervising Nurse Frierson. Further questioning, however, significantly undermined this statement, as Dr. Axelbank later agreed that neither Dr. Farmer nor Dr. Ball violated the standard of care. The trial court, however, ruled that this statement did "not address Dr. Ball's responsibility to supervise [N]urse Frierson."

[37] We also note that despite the Defendant Doctors' argument in their appellee's brief that this claim was not properly pleaded, Plaintiff chose not to file a reply brief in support of any contention that this was a proper claim.

38

there is no proof that Nurse Frierson was unfit for her job or that Dr. Ball (or any of the Defendant Doctors) had knowledge of Nurse Frierson's alleged unfitness. As such, to the extent that this claim was raised, it is not supported by the proof. The trial court's decision to allow this claim to proceed is therefore reversed.

We note, however, that a similar claim was raised in Plaintiff's complaint—that the Defendant Doctors should be liable for any negligence committed by Nurse Frierson under the doctrines of joint and several liability and *respondeat superior*. Specifically, Plaintiff asserted that the Defendant Doctors entered into a joint venture subjecting them to joint and several liability and that they were liable for the acts and omissions of their employees. With regard to joint and several liability, Tennessee law provides that "[e]ach of the several joint venturers has the power to bind the others and to subject them to liability to third persons in matters which are strictly within the scope of the joint enterprise." **Robertson v. Lyons**, 553 S.W.2d 754, 757 (Tenn. Ct. App. 1977). The doctrine of *respondeat superior* permits a principal to be held liable for the negligent acts of its agents. **Johnson v. LeBonheur Children's Med. Ctr.**, 74 S.W.3d 338, 346 (Tenn. 2002). It is often implicated in the employer-employee relationship. *See, e.g.,* **Gunter v. Estate of Armstrong**, 600 S.W.3d 916, 923 (Tenn. Ct. App. 2019), *perm. app. denied* (Jan. 15, 2020) (discussing the circumstances in which an employer may be held liable for an employee's negligence). The trial court's reliance on Dr. Axelbank's testimony that the doctors were "ultimately responsible" for the negligence of their employed nurse practitioner appears to fall more within a claim of vicarious liability premised on *respondeat superior* than a claim for negligent supervision.

Defendant Doctors assert on appeal, however, that all claims against them should be denied under these theories, citing what they claim are the undisputed facts in their favor on this issue. However, we have held that the trial court properly denied summary judgment as to one claim related to the pain and suffering that Ms. Grimes experienced following the October 20th visit. As an initial matter, we note that it does not appear that that Defendant Doctors' motion for summary actually addressed in any specific fashion Plaintiff's claim that Defendant Doctors should be liable under a *respondeat superior* theory. It is therefore no surprise that the trial court did not specifically address this issue in its order. Rather, the only reference to this specific claim is in two parts of the trial court's order. First, in denying summary judgment on the pain and suffering claim, the trial court stated that "[s]ummary judgment is denied on the issues of whether or not the defendants Dr. []Ball and Family Health Group caused Ms. Grimes injury [and] suffering[.]" The trial court further ruled that summary judgment was denied "on all other issues not specifically addressed in this Order." This theory, however, should be specifically ruled on by the trial court in the first instance. *See* **Dorrier v. Dark**, 537 S.W.2d 888, 890 (Tenn. 1976) ("This is a court of appeals and errors, and we are limited in authority to the adjudication of issues that are presented and decided in the trial courts . . . ."); **Johnson v. Rutherford Cty.**, No. M2017-00618-COA-R3-CV, 2018 WL 369774, at *9 (Tenn. Ct. App. Jan. 11, 2018) (citing **Dorrier**, 537 S.W.2d at 890) ("[T]he trial court did not rule on [the] motion for summary

judgment; therefore, this Court could not address it in the first instance."); ***In re Estate of Boykin***, 295 S.W.3d 632, 636 (Tenn. Ct. App. 2008) (quoting ***Dorrier***, 537 S.W.2d at 890) ("At the appellate level, 'we are limited in authority to the adjudication of issues that are presented and decided in the trial courts[.]'"). Still, we note that the trial court limited this claim only to Dr. Ball and Family Health Group, having dismissed all claims against Dr. Farmer, discussed in detail, *infra*. As Plaintiff has not specifically addressed this ruling or its *respondeat superior* claim in her appellate brief, we decline to disturb the trial court's conclusion that this claim relates solely to Dr. Ball and Family Health Group. Otherwise, we will not address on appeal Dr. Ball and Family Health Group's argument that this claim should be dismissed; it may be further litigated in the trial court.

### 4. Other Rulings of the Trial Court

The trial court granted summary judgment to Dr. Farmer and dismissed him from the lawsuit due to the fact that Dr. Axelbank had no criticisms of Dr. Farmer's decision to prescribe Pradaxa, that Dr. Farmer had no involvement with Ms. Grimes after October 7, and that he did not supervise the Nurse Practitioner who saw Ms. Grimes on October 20. After a thorough review of the record, we agree. In particular, we rely on this portion of Dr. Axelbank's deposition:

> A. And I'm sorry to take you down there. But you asked did I have any problems with Dr. Farmer's supervisory -- supervising, and I'll say no to that.
> Q. Okay. So if we take out -- you've got no criticism of his decision to prescribe Pradaxa, you've got no criticism of any component of his prescription of Pradaxa including informed consent and you now agree that he has no -- you have no criticism of any supervisory role he played. Can we agree that you have no criticism of Dr. Farmer who never saw this patient after October 7th?
> A. Yes.
> Q. Okay.
> A. Agreed.
> Q. Okay. All right. So that eliminates Dr. Farmer in Dr. Axelbank's view, correct?
> A. Yes.

Based on this testimony, the undisputed material facts, and the record as a whole, we conclude that there are no genuine issues of disputed fact that would preclude the grant of summary judgment to Dr. Farmer. Given that we have previously declined to disturb the trial court's vicarious liability ruling as applying only to Dr. Ball and Family Health Group, we affirm the trial court's dismissal of Dr. Farmer from this suit *in toto*.

The trial court also granted summary judgment to Defendant Doctors on the issue

of whether it was medical negligence to prescribe Pradaxa and Xarelto simultaneously. There are no statements or responses in the Rule 56.03 statement of undisputed facts addressing the alleged simultaneous prescription of Xarelto and Pradaxa, which are both blood thinners. However, the proof set forth by the parties makes clear that Ms. Grimes never took the Xarelto. In light of the lack of proof that Ms. Grimes took the Xarelto or suffered any injury therefrom, we affirm the trial court's grant of partial summary judgment in this regard.

## IV. CONCLUSION

For the foregoing reasons, we affirm the grant of summary judgment to James Dickerson and Rite Aid. We affirm in part and reverse in part the trial court's grant of partial summary judgment to Drs. Farmer and Ball and Family Health Group. Specifically, we affirm the trial court's evidentiary rulings on the basis of waiver, affirm the grant of summary judgment to the Defendant Doctors on the claims that their negligence caused or hastened the death of the decedent, that they failed to obtain informed consent in their treatment of the decedent, and related to the prescription of both Pradaxa and Xarelto. We affirm the complete grant of summary judgment to and dismissal of Dr. Farmer. We affirm the trial court's denial of summary judgment to Dr. Ball and Family Health Group on whether Nurse Frierson's actions caused Ms. Grimes' injury and suffering during the period of October 20 until she was stabilized in the hospital and whether Dr. Ball and Family Health Group should be vicariously liable for any such negligence. We reverse the trial court's refusal to grant summary judgment on any purported "failure to supervise" claim.

In sum, the judgment of the Maury County Circuit Court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to Appellants Teresa Grimes Kidd and Estate of Doris Ann Holt Grimes, and one-half to Appellees Charles Albert Ball, M.D., and Family Health Group, Inc., for all of which execution may issue, if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

41